Sophie L. Fischer, Appellant, v. Slayton & Company, Inc., a Missouri Corporation, and Hovey E. Slayton, Appellees.

Gen. No. 46,683.

First District, Third Division.

May 2, 1956.

Rehearing denied May 24, 1956.

Released for publication June 14, 1956.

Theodore H. Schlake, of Chicago, for appellant.

Lewis, Overbeck & Furman, of Chicago, for defendant-appellee, and cross-appellant; Donald P. Vail, of Chicago, of counsel.

JUDGE FEINBERG delivered the opinion of the court.

Plaintiff's complaint is for accounting against defendant, arising out of certain stock transactions between plaintiff and defendant, as a broker. The action as to Hovey E. Slayton was dismissed. The cause was referred to a master, who heard the evidence, reported his findings of fact and conclusions of law, and recommended that the complaint be dismissed for want of equity. Upon a hearing of plaintiff's exceptions to the master's report, a decree was entered overruling the exceptions and dismissing the complaint for want of equity. The appeal is from this decree.

The pertinent facts out of which the controversy arose are: that plaintiff, during the year 1940, commenced dealings in securities with William A. Schuberth, then a licensed security salesman for Joseph Dixon & Company, a brokerage firm dealing in the stocks and securities; that he acted as her agent and representative from 1940 until August 1943, when Schuberth's employment with Dixon terminated (for what reason is not disclosed). He entered the employment of defendant company in September 1943, and brought with him to the defendant the account and securities he handled for plaintiff.

It appears that in the account of plaintiff taken by Schuberth to defendant were so-called "Group Securities." These securities were sold by defendant, and the

168

proceeds, amounting to $5295, were invested in "Managed Funds, Inc." In addition to the sum realized from the sale of the "Group Securities," defendant also received from plaintiff further sums aggregating $2327.55, making a total of $7622.55. There must be added to this amount $1245.89, interest paid to defendant on loans made, or an admitted total outlay by her of $8868.44. From time to time during her dealings with defendant through Schuberth, securities were purchased for plaintiff's account, and loans were made against them, and with such loans additional securities were purchased for plaintiff's account.

It further appears, and the master so found, that "Managed Funds, Inc." is a corporation which was organized in 1946 by defendant and owned and managed by the defendant company. Thus, when plaintiff's "Group Securities," which had been paying dividends, were converted by defendant into "Managed Funds, Inc.," it was a conversion into securities owned, controlled, managed and dealt in by defendant in "Managed Funds, Inc."

It also appears that each time defendant purchased securities in "Managed Funds, Inc." for plaintiff, they charged her 9% commission. The master also found that plaintiff has suffered some substantial losses in her investments in "Managed Funds, Inc." The details of these losses appear in the master's finding No. 17.

It appears that "Managed Funds, Inc." had no record of performance or payment of dividends at the time they converted plaintiff's "Group Securities" into "Managed Funds, Inc." The master also made the following finding:

"There can be no doubt that the plaintiff had a great degree of trust and confidence in Schuberth; not only did she make no records of the monies which she put into his hands (despite the fact that her job as a bookkeeper should have made her cognizant of the value of

169

records) but, according to her testimony, she took Schuberth's word as to what to sign, what to buy, what to sell and what to do with her financial matters. Schuberth was even entrusted with the task of making out the plaintiff's income tax returns (Defendant's Exhibit '19') which were forwarded to the proper government officials without the plaintiff's having any accurate knowledge of their content. In her testimony, the plaintiff revealed that she did not have a basic understanding of financial matters and it is entirely credible that she would have sought the aid of such a person as Schuberth, in whom she could repose her confidence and who had the experience and knowledge to render her professional services in order to guide her financial affairs."

■ These findings of the master, having been approved by the court and not excepted to by defendant, are controlling against defendant. We think there is ample support in the record for these findings.

When Schuberth brought plaintiff's account to defendant, together with the securities in her account, against which some loans were outstanding, it was incumbent upon defendant to ascertain what the relationship was between Schuberth and the plaintiff, and the nature of his transactions with her. Having taken over her account and allowed Schuberth to continue to act for her as he did when he was connected with Dixon, defendant was responsible for leading plaintiff to believe that her trust and confidence in Schuberth, and the fiduciary relationship existing, continued in her dealings with defendant through Schuberth. Zegarski v. Ashland Savings & Loan Ass'n, 4 Ill.App. 2d 118, 122.

Defendant upon this appeal admits: "These transactions, until his resignation in June, 1948, were handled for her by Schuberth on behalf of Slayton & Company. He had gained her complete confidence while

170

with Dixon & Co., and continued to enjoy that confidence until a short time before his death." Schuberth died April 30, 1949, prior to the commencement of this action. His testimony was not available, and conversations between plaintiff and Schuberth, while he was connected with defendant, were not competent.

■ We think the record justifies the conclusion that defendant cloaked Schuberth with sufficient apparent scope of authority to continue the fiduciary relationship between him and plaintiff.

In Hartford Life Ins. Co. v. Sherman, 123 Ill. App. 202, affirmed 223 Ill. 329, it was said:

". . . A person dealing in good faith with an agent who is apparently acting within the scope of his authority is not responsible for any breach of trust the agent may perpetrate upon his principal. Where one of two innocent contracting parties must suffer from the . . . unauthorized act of an agent, the loss should fall on him who selected the agent and whom the agent represents. One dealing with an agent is not bound to be on the watch lest the agent wrong his principal. Where the acts of the agent will bind the principal, his representations respecting the subject-matter, made while he is transacting the business and executing his authority, will also bind the principal, even though such representations are fraudulent."

In Northern Illinois Coal Corp. v. Cryder, 361 Ill. 274, 287, it was held:

". . . the principal is bound to the same extent by the authority assumed and exercised, with the apparent authority of the principal, as by the authority actually granted."

■ While the fiduciary relationship existed defendant had no right to engage in self-dealing by the conversion of plaintiff's "Group Securities" into "Managed Funds," by the subsequent purchases for plaintiff

171

in "Managed Funds," and charging her a commission of 9% upon each purchase.

What we said in Holyoke v. Continental Illinois Nat. Bank & Trust Co., 346 Ill. App. 284, 295, and cases there cited concerning self-dealing by a fiduciary, is applicable here:

"This court . . . in Continental Illinois Nat. Bank & Trust Co. v. Kelley, 333 Ill. App. 119, said:

" 'It is a salutary rule, long recognized, that a trustee may not engage in self-dealing in the performance of its duties as trustee, which results in loss to the trust. To relax this rule would be dangerous to the trust in too many other instances—instances where the trustee may not be in a position to make good the loss. The question of negligence or good faith does not enter into it. As was said by the Supreme Court in Miles v. Wheeler, 43 Ill. 123, at p. 126:

" ' "It avails nothing to show that the intentions of the trustee were honest, and that there was no fraud in fact. It is one of those cases in which the law will not permit a trustee to palter with his own conscience. It shields him from all temptation by the inflexible rule that he cannot buy. The plain and sufficient reason is that the interests of the buyer and seller of the same property are necessarily antagonistic, and the only safe rule is one which absolutely forbids a trustee to occupy two positions inconsistent with each other." ' Citing Joliet Trust & Savings Bank v. Ingalls, 276 Ill. App. 445, 450; Magruder v. Drury, 235 U. S. 106.

"In Nonnast v. Northern Trust Co., 374 Ill. 248, 261, the court adopted with approval the frequently quoted language of Justice Cardozo in Meinhard v. Salmon, 249 N. Y. 458:

" 'Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to

172

something stricter than the morals of the market place. Not honesty alone, but the *punctilio* of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. (Wendt v. Fischer, 243 N. Y. 439, 444.) Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.' "

Such fiduciary relation is not limited to cases of trustee and cestui que trust, guardian and ward, attorney and client, or other recognized legal relations, but it exists in all cases where confidence is reposed on the one side and a resulting superiority and influence on the other side arises therefrom. The origin of the confidence is immaterial. Schweickhardt v. Chessen, 329 Ill. 637, 649.

■ Any profit which the fiduciary makes through the self-dealing, he must account for to his principal, and may be recovered by the principal from the fiduciary. This would include the 9% commission charged upon each purchase for plaintiff in "Managed Funds."

In Wobbe v. Schaub, 143 Ill. App. 361, 369, it was held:

" 'It is universally held that a trustee employing the trust funds in his own business or for his own benefit is liable for interest thereon, upon the principle that he shall derive no gain, benefit or advantage from the trust fund, and whatever profit may be made therewith properly belongs to the trust estate.' 28 Am. & Eng. Enc. of Law (2nd Ed.) 1081, and cases cited."

Likewise, if the "Group Securities" sold by defendant, and the proceeds invested in "Managed Funds," had greater value at the time the account with plain-

tiff was closed on October 3, 1950, than her securities in "Managed Funds," defendant would be liable for such increase in value which was lost to plaintiff. We cannot reconcile the recommendation of the master, that the instant complaint should be dismissed for want of equity, in the light of his finding:

"It is true, of course, that some benefit accrued to the defendant from the change [meaning the change from "Group Securities" to the investment in "Managed Funds"], in that the principals of the defendant were also the principals of Managed Funds. Thus, the defendant obtained commissions that it would not have otherwise obtained, since the profits obtained from Managed Funds inured to the benefit of the defendant rather than to strangers."

We cannot agree with the master's finding that defendant has fully accounted to the plaintiff, and that she was apprised of each of the transactions with the defendant. True, its statements to plaintiff showed investments in "Managed Funds," but the record is barren of evidence that plaintiff knew that defendant organized, owned and controlled "Managed Funds, Inc.," and that it was engaged in self-dealing. Nor was plaintiff apprised that defendant, as a fiduciary, had no legal right to charge her 9% commission upon each purchase involved in the self-dealing transactions. Where such knowledge is lacking, ratification of defendant's conduct, as fiduciary, cannot be claimed.

We think upon this record plaintiff is entitled to an accounting as to the 9% commission referred to, as well as for any ultimate loss she sustained by reason of the conversion of "Group Securities" into "Managed Funds."

Accordingly, the decree is reversed and the cause remanded with the directions to re-refer the cause to a master to consider the evidence already received on the prior hearing and such additional evidence as may

174

be offered by either of the parties, and for a further accounting in harmony with the views herein expressed.

Reversed and remanded with directions.

KILEY, J., concurs.

LEWE, P. J., took no part.